UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-81162-CIV-ROSENBAUM
(Consent Case)

MARY H. PETERS, M.D.,

      Plaintiff,

v.

JAMES B. PEAKE, Secretary of
Veterans Affairs,

      Defendant.

_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court upon Defendant's Motion for Summary Judgment With Supporting Statement of Facts and Memorandum of Law ("Motion for Summary Judgment"). [D.E. 14]. The Court has carefully considered the Motion, Plaintiff's Memorandum in Opposition [D.E. 18], Plaintiff's Statement of Disputed Material Facts [D.E. 19], and Defendant's Reply [D.E. 20], as well as the attached exhibits, deposition transcripts, and affidavits of various witnesses in this case. After a full review, the Court denies Defendant's Motion for Summary Judgment.[1]

### *BACKGROUND*

On December 12, 2008, Plaintiff Mary H. Peters, M. D. ("Plaintiff" or "Peters"), filed a one-count Amended Complaint alleging that her former employer, James B. Peake, Secretary of Veterans Affairs ("Defendant"), violated the Civil Rights Act of 1964, § 701, *et seq.*, as amended by 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1991, §102, *et seq.* ("Title VII") by failing to protect Plaintiff from retaliation after she complained about sexual harassment in the workplace. [D.E. 4].

_____

[1] The Court notified the parties of its decision to deny the Motion for Summary Judgment during the week prior to trial. The Court also informed the parties that, due to the press of other issues, it would provide its written opinion at a later date.

Plaintiff asserts that she is a female physician who worked at the Veterans Administration Medical Center in West Palm Beach Florida (the "VA Center") when, in November of 2005, she complained of a hostile work environment (*i.e.*, sexual harassment) and, just days later, she "was removed from her position as a physician and, instead, placed in a clerical/administrative position." D.E. 4 at 7. Following this removal and Defendant's other alleged efforts to force Plaintiff to quit, Defendant terminated Plaintiff's employment. *Id.* Plaintiff contends that Defendant's actions were in retaliation for her complaint of sexual harassment. Defendant responds that it did not retaliate against Plaintiff and that it had legitimate non-retaliatory reasons for its actions.

### *MATERIAL FACTS*[2]

On November 28, 2004, the VA Center hired Plaintiff to work as a hospitalist, a position that includes administering medical care to patients who are admitted to the VA Center. As a new employee at the VA Center, Plaintiff was considered to be a probationary employee for two years. Pursuant to the VA Center's policies, a probationary employee can be terminated for unsatisfactory performance without being given an opportunity to improve. According to Plaintiff, some time in September or October of 2005, during her employment with the VA Center, an emergency room doctor named Dr. Rao became interested in Plaintiff in a sexual manner. Dr. Rao allegedly made sexual comments to Plaintiff regarding her physical appearance and dress, invited Plaintiff to social outings, and, on one occasion, touched Plaintiff in a sexual way while both worked at the VA Center.

---

[2] The Court has set forth the material facts based upon its review and consideration of Defendant's Statement of Undisputed Material Facts [D.E. 14], Plaintiff's Statement of Disputed Material Facts [D.E. 19], and affidavits and deposition transcripts of the various witnesses in this case, including any attached exhibits. The Court further notes that pursuant to Local Rule 7.5.D, all material facts set forth in Defendant's statement and supported by evidence of record are deemed admitted unless controverted by Plaintiff's statement.

On November 9, 2005, Plaintiff complained to the VA Center's EEO Program Manager, Diane Dilkes ("Ms. Dilkes"), that Plaintiff was being sexually harassed by Dr. Rao.  Thereafter, on November 16, 2005, Plaintiff met with one of Dr. Rao's supervisors, Dr. Israel Alvarez ("Dr. Alvarez"), and Dr. Alvarez inquired into Plaintiff's allegations.  Plaintiff felt that Dr. Alvarez did not take her concerns about Dr. Rao seriously and, consequently, Plaintiff memorialized her complaint in writing and submitted the complaint to Ms. Dilkes on November 29, 2005.  After further investigation, the VA Center's director and Chief Executive Officer, Mr. Edward Seiler (" Mr. Seiler"), terminated Dr. Rao's employment.

Shortly thereafter, in early December of 2005, the Chief of Medicine, Dr. Ramesh Loungani ("Dr. Loungani"), who served as one of Plaintiff's supervisors, selected Plaintiff to work part-time in the Compensation and Pension Unit ("C&P" or "C&P Unit") at the VA Center.  According to Plaintiff, the C&P position was, in large part, clerical work and an assignment that took her away from her position as a practicing physician.  Plaintiff also contends that the work performed in the C&P Unit need not be performed by a physician, and that time spent in the C&P Unit would cause Plaintiff to potentially lose her treatment skills and jeopardize her license to practice medicine.

Defendant states, and Plaintiff does not dispute, that the C&P Unit serves an important function at the VA Center because those who work in C&P determine whether a veteran's claimed injury or illness is related to his or her military service and determine ultimately, whether the veteran is eligible to receive compensation or medical coverage.  If the veteran's injury/illness is determined to be service-related, he or she will receive medical care by the VA Center and may also receive disability payments depending on the severity of the injury/illness.  If those who work in the C&P Unit determine that the injury/illness is not service connected, however, the veteran may not receive these benefits.

Although the parties do not dispute that a need arose for coverage in the C&P Unit and that Dr. Loungani selected Plaintiff to fill that void, the parties debate greatly how and why Plaintiff came to be selected to serve in the C&P Unit.  The Court notes that it must take the facts in the light most favorable to Plaintiff,[3] but sets forth the events from each parties' perspective so that it may establish a complete picture of the parties' positions.

According to Defendant, in the fall of 2005, the C&P Unit began to suffer a physician staffing shortage because two physicians working in the unit returned to active military duty, and a third physician working in C&P transferred to another section of the hospital.  To fill the void, Dr. Loungani decided to implement a rotation of doctors through the C&P Unit and anticipated that each physician detailed to C&P would remain there for approximately 3-4 months and would work in the Unit for 20% of the physician's work hours (*i.e.*, one day) during the week.  Dr. Loungani decided that the details to C&P would be filled by hospitalists under his supervision.  In furtherance of this decision, Dr. Loungani spoke with Dr. Ann Raimondi ("Dr. Raimondi"), the section chief for the hospitalists, to obtain her recommendation with respect to filling the vacancy in the C&P Unit.  Dr. Loungani states that Dr. Raimondi recommended a "floater" – a hospitalist who was not assigned to a panel of patients but, rather, was assigned to respond to any situations relating to patient care that arose during that hospitalist's shift. Dr. Raimondi felt that assigning a floater to C&P would have the least impact on patient care.

Because the examinations conducted in the C&P Unit are completed during the day shift (*i.e.*, from approximately 8:30 a.m. to 4:00 p.m.) and floaters typically work in the afternoon or evening shift, Dr. Loungani concluded that the floater selected to be detailed to the C&P Unit would need

---

[3]   *See Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002).

to temporarily move to the day shift. Defendant contends that at the end of 2005, four floaters worked during the evening shift – one of which was Plaintiff, who Dr. Loungani had been told, had requested to be moved to the day shift. Defendant states that Plaintiff was also one of the most junior of the floaters. According to Defendant, in early December of 2005, Drs. Loungani and Raimondi met with Plaintiff to discuss whether she would be interested in the detail to the C&P Unit. Dr. Loungani states that the following day, once Plaintiff had an opportunity to speak with her family, Dr. Raimondi indicated that Plaintiff accepted the temporary detail to C&P. Consequently, on December 7, 2005, Dr. Loungani issued a memorandum detailing Plaintiff to the C&P Unit. With respect to Plaintiff's allegation that her assignment to the C&P Unit was retaliatory, Dr. Loungani claims that he did not supervise or even know Dr. Rao and further emphasizes that he did not have knowledge of Plaintiff's sexual harassment complaint at the time that he made the decision to detail Plaintiff to C&P.

Plaintiff's version of events varies greatly from Defendant's. Although Plaintiff agrees that Dr. Loungani authored a memorandum dated December 7, 2005, in which he transferred her to the C&P Unit, she disagrees in most other respects with how and why she was selected for the position. In sharp contrast to Dr. Loungani's contentions, Plaintiff denies that any meeting occurred between Dr. Loungani and Plaintiff in early December of 2005, regarding her potential assignment to the C&P Unit. Likewise, Plaintiff asserts that she never agreed to accept the position in the C&P Unit, but rather, had no choice in Dr. Loungani's selection of her to C&P.

In support of her allegation that she was detailed to the C&P Unit in retaliation for complaining about sexual harassment, Plaintiff emphasizes that Dr. Loungani had approximately 20 hospitalists to choose from, including other hospitalists who were junior to Plaintiff at the time she was selected for the detail. Additionally, Plaintiff points out that despite Dr. Loungani's stated

intentions, no rotation of the hospitalists through the C&P Unit was ever established.

Plaintiff also refutes Dr. Loungani's statement that he did not know about Plaintiff's sexual harassment claim at the time he made his decision to detail Plaintiff to C&P. In this regard, Plaintiff points to a Memorandum signed by Dr. Loungani and dated March 22, 2006, which indicates that Dr. Loungani became aware of Plaintiff's sexual harassment complaint on November 16, 2005 – a short time prior to his decision to detail Plaintiff to C&P. Consequently, Plaintiff contends that Dr. Loungani lied when he stated that he did not know about her sexual harassment complaint at the time he selected her to work in the C&P Unit. Plaintiff emphasizes this fact, along with the very short time frame between Plaintiff's complaint of harassment and her detail to the C&P Unit as evidence of Dr. Loungani's retaliatory intent. Finally, according to Plaintiff, Dr. Loungani admitted that he previously utilized an assignment to the C&P Unit to isolate an employee whom he considered to be uncooperative and difficult. More specifically, Dr. Loungani previously transferred Dr. Kishel to the C&P Unit and told Plaintiff that he made the assignment because Dr. Kishel was "disruptive" and a "trouble maker."

Between December of 2005 and May of 2006, various events occurred which Plaintiff labels as further evidence that Defendant retaliated against Plaintiff for filing her complaint of sexual harassment against Dr. Rao. First, within one month of Plaintiff's reassignment to the C&P Unit, Dr. Loungani sought to move Plaintiff's office to the 7th floor of the VA Center, where she claims no other hospitalists kept offices. In Plaintiff's view, by deciding to move Plaintiff's office from the 6th floor of the hospital where all other hospitalists worked and maintained offices, to the 7th floor, Dr. Loungani attempted to limit Plaintiff's interaction with other hospitalists as well as remove

Plaintiff from seeing and treating patients.[4]

Also during this time period, Plaintiff was "written up" by her immediate supervisor Dr. Deepak Mandi ("Dr. Mandi") as well as Dr. Loungani on a number of occasions in what Plaintiff alleges was an attempt to create a paper trail to justify her termination. For example, in May of 2006, Plaintiff received two proficiency reports that indicated negative job performance. Additionally, according to Dr. Raimondi, Dr. Mandi asked her to downgrade her satisfactory evaluation of Plaintiff's work performance. Dr. Raimondi explained that Dr. Mandi approached her after reviewing and disagreeing with her evaluation of Plaintiff, and that Dr. Mandi asked Dr. Raimondi to note Plaintiff's alleged negative behavior in the evaluation. When Dr. Raimondi stated that she would not change her evaluation of Plaintiff, Dr. Mandi became annoyed. Finally, following several negative reports, Drs. Mandi and Loungani referred Plaintiff to a probationary review board and recommended that Plaintiff be terminated.

Defendant's version of the facts, again, differs substantially from Plaintiff's and includes assertions that Plaintiff failed to perform her job adequately and, thus, that Defendant was justified in terminating Plaintiff's employment. First, Defendant states that Plaintiff refused to report to the C&P Unit for training on a number of occasions and that Plaintiff committed various acts of insubordination such as yelling at, hanging up on, and refusing to speak with her supervisor Dr. Mandi. Additionally, Defendant contends that Plaintiff refused to take an on-call beeper from a colleague and resisted accepting a panel of patients to whom she was assigned. More specifically, Defendant notes that Plaintiff began to refuse to report to the C&P Unit in January and refused to report as instructed on February 6-10th, February 13th, and February 15th of 2006. On March 2, 2006,

---

[4]    Although Dr. Loungani attempted to move Plaintiff's office to the 7th floor of the VA Center, the Court notes that this change never occurred.

Dr. Loungani provided Plaintiff with a notice of proposed reprimand for her failures to report to C&P. Thereafter, on March 22, 2006, Dr. Loungani issued an official reprimand to Plaintiff in which he advised Plaintiff that "future incidents of this nature could lead to more serious disciplinary action." According to Defendant, even after receiving the reprimand, Plaintiff refused to report to the C&P Unit when directed. Additionally, Defendant cites instances during this time frame where Plaintiff hung up the telephone on Dr. Mandi and refused to accept patient assignments from Dr. Raimondi.

Plaintiff denies that she refused to report to C&P and, instead, explains that there were occasions when she could not attend training due to her own medical appointments or when she had obligations to patients whom she could not leave. Plaintiff further justifies any perceived "no shows" in the C&P Unit by stating that on a number of occasions, Dr. Mandi made last-minute changes to her schedule. Dr. Raimondi, in her deposition testimony, agreed that there were times when she would draft a schedule providing Plaintiff with time off and Dr. Mandi would later revise the schedule and deny Plaintiff the leave she requested. Plaintiff also denies being disrespectful to Dr. Mandi as well as the other acts of insubordination that Defendant claims Plaintiff committed.

Although the parties disagree about many of the facts occurring between December of 2005 and May of 2006, they do agree that in May of 2006, Drs. Loungani and Mandi made a recommendation that the VA Center empanel a Summary Probationary Review Board (the "Board") to reevaluate Plaintiff's behavior. The doctors also recommended that Plaintiff's employment be terminated based on her alleged acts of insubordination and poor job performance. The VA Center selected a three-doctor Board with Dr. Alvarez serving as the chairman and Drs. Toni Ferrario and Albert Ammann comprising the remaining two members. The VA Center placed Plaintiff on non-duty status pending a recommendation from the Board. On May 31, 2006, the Board met and heard

8

statements from various witnesses, including Plaintiff.  Plaintiff states that although the Board permitted her to read from a prepared statement, she did not receive the opportunity to present any documentation or cross examine witnesses.  Additionally, Plaintiff complains that the Board failed to address her claims of retaliation and, instead, limited the hearing to Drs. Mandi and Loungani's allegations of insubordination.

Upon consideration of the evidence, the Board recommended that Plaintiff be terminated from her employment with the VA Center.  Plaintiff received notice from the VA Center on June 12, 2006, that her employment was terminated effective July 2, 2006.

*ANALYSIS*

A.   **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986)).  A fact is material if "it would affect the outcome of the suit under the governing law . . . ."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

Following a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party, and resolves all reasonable doubts against the movant.  *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002);

9

*Johnson v. City of Mobile*, 321 F. App'x 826, 2009 WL 724025, at *4 (11th Cir. March 20, 2009).

Further, the Court will not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140

(11th Cir. 2007), *reh'g and reh'g en banc denied*, 245 F. App'x 803 (11th Cir. 2007).  Thus, upon

discovering a genuine dispute, the Court promptly will deny summary judgment.  *Id.*

      The moving party shoulders the initial burden of showing the absence of a genuine issue of

material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party

satisfies this burden, "the nonmoving party 'must do more than simply show that there is some

metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819,

2009 WL 977313, *4 (11th Cir. Apr. 13, 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986)).  Instead, "the non-moving party 'must make a sufficient

showing on each essential element of the case for which he has the burden of proof.'"  *Id.*  (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the nonmoving party must

produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers

to interrogatories, and admissions on file, designating specific facts suggesting that a reasonable jury

could find in his favor.  *Shiver*, 549 F.3d at 1343.

**B.    Plaintiff's Retaliation Claim**

      **1.    Establishing a Retaliation Claim, Generally**

      Title VII makes it unlawful for an employer to retaliate against an employee or job applicant

"because he has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *See also Burlington

Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 56 (2006).  A plaintiff may establish a

*prima facie* case of retaliation in one of two ways: (1) by direct evidence of retaliatory intent; or (2) through circumstantial evidence.

### a.    Direct Evidence

The Eleventh Circuit has held that direct evidence of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Kilpatrick v. Tyson Foods, Inc.*, 268 F. App'x 860, 861-62 (11th Cir. 2008). Such direct evidence reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee," and must indicate that the adverse employment decision was motivated by the decision-maker's intent to discriminate. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)). As a result, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence." *Kilpatrick*, 268 F. App'x at 862.[5]

### b.    Circumstantial Evidence

Where a plaintiff has no direct evidence, she may establish a *prima facie* case of retaliation

---

[5]    Plaintiff relies on Judge Tjoflat's opinion in *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999), to argue that the Eleventh Circuit has adopted a more relaxed definition of "direct evidence." According to Plaintiff, "direct evidence" is "evidence from which a reasonable trier of fact could find, more probably then not, a causal link between an adverse employment action and a protected personal characteristic." *Id.* at 1293. Plaintiff's reliance on Judge Tjoflat's definition is misplaced because courts have found the definition to be "mere obiter dictum" since it was not necessary to the resolution of the case and neither of the other two members of the panel joined in that portion of the opinion. Indeed, as the Court in *Copely v. Bax Global, Inc.*, 80 F. Supp. 2d 1342, 1348 (S.D. Fla. 2000) observed, the Eleventh Circuit has not since applied Judge Tjoflat's definition of direct evidence. Likewise, in *Damon*, the Eleventh Circuit implicitly recognized Judge Tjoflat's definition as dicta and, instead, used the traditional concept of direct evidence as set forth herein.   .

through circumstantial evidence.  In evaluating whether a plaintiff has established a *prima facie* case

of retaliation through the use of circumstantial evidence, the Eleventh Circuit has applied the burden-

shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under

the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of retaliation,

which creates a presumption that the employer retaliated against her.  *Curtis v. Broward County*, 292

F. App'x 882, 883 (11th Cir. 2008) (citing *Brooks v. County Comm'n of Jefferson County, Ala.*, 446

F.3d 1160, 1162 (11th Cir. 2006)).

Where the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

defendant to come forward with evidence of a legitimate, non-retaliatory reason for the challenged

adverse employment action, which rebuts the presumption of retaliation.  *Id.*, *Pennington v. City of*

*Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citing *Olmstead v. Taco Bell Corp.*, 141 F.3d

1457, 1460 (11th Cir. 1998)); *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1378 (S.D. Ga. 2008).  If

the defendant meets this burden of production, the burden then shifts back to the plaintiff to establish

that the defendant's proffered reasons are merely pretext for the employer's retaliatory action.  *Id.*

In other words, Plaintiff must come forward with evidence "sufficient to permit a reasonable

factfinder to conclude that the reasons given by the employer were not the real reasons" for the

employment action. *Perrero v. Spectacor Mgmt. Group*, 308 F. App'x 327, 329 (11th Cir. 2009)

(quoting *Chapman v. A.I. Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)).  If pretext is established

by the plaintiff, the defendant may still assert a "mixed-motive" defense – that the defendant would

have made the same decision without an illegal motive.  *Pennington*, 261 F.3d at 1268-69; *Brown*,

563 F. Supp. 2d at 1378.  Under these circumstances, the defendant may avoid a finding of liability

only by proving by a preponderance of the evidence that it would have made the same decision in

the absence of the alleged bias. *Id.* (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258 (1989)).

    **c.**    **Plaintiff Seeks to Establish Her Claim Through Circumstantial Evidence**

Here, although Plaintiff contends that direct evidence of retaliation exists, she has not pointed to any overt comments, documents, or any other direct indicia of retaliation. Hence, the Court finds that Plaintiff endeavors to establish the elements of a *prima facie* case through circumstantial evidence. Accordingly, the Court will address whether Plaintiff has established her claim through circumstantial evidence.

    **2.**    **Establishing a Prima Facie Case of Retaliation**

To successfully assert a claim for retaliation, Plaintiff must demonstrate the following: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pennington*, 261 F.3d at 1266; *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001), *abrogated on other grounds*; *Olmstead*, 141 F.3d at 1460; *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).

In this case, no dispute exists that Plaintiff engaged in statutorily protected activity by filing a complaint alleging sexual harassment.[6] Likewise, in its Motion for Summary Judgment, Defendant concedes for purposes of the motion that Plaintiff suffered an adverse employment action.[7]

---

    [6]   A plaintiff need not prove that a defendant's behavior legally constituted harassment in order to recover for retaliation. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (a plaintiff does not need to prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed).

    [7]   Although Defendant cites to Plaintiff's termination as the sole adverse employment action, the Amended Complaint reveals that Plaintiff also alleges that other actions taken by the VA Center constitute adverse employment actions. For instance, Plaintiff alleges that the initial

Defendant, however, contends that Plaintiff cannot establish a *prima facie* case of retaliation because Plaintiff cannot show a causal link between her prior sexual harassment complaint against Dr. Rao and the decision to terminate her employment. Defendant emphasizes that neither Dr. Mandi nor Dr. Loungani (the doctors who recommended Plaintiff's separation) had any allegiance to Dr. Rao because they did not know him. Defendant also argues that Plaintiff's termination was based upon her unsatisfactory job performance, poor attitude with respect to her selection for the C&P Unit, and acts of insubordination. According to Defendant, Plaintiff "self-destructed" in her work assignment to the C&P Unit and, thus, her termination was not a violation of Title VII. Consequently, Defendant contends that Plaintiff cannot establish a causal connection because other than her speculation, Plaintiff has no evidence to link her complaint of harassment with her termination.

Although a jury may ultimately find Defendant's contentions to be true, the Court concludes that there are genuine issues of material fact regarding whether a causal connection exists between Plaintiff's sexual harassment complaint and the various adverse employment actions that Plaintiff

---

decision to select her to report to the C&P Unit constitutes an adverse employment action. Defendant addresses this allegation in its Reply to the Motion for Summary Judgment. Likewise, Plaintiff contends that the effort to change her office location from the sixth floor to the seventh floor was also an adverse employment action. Further, Plaintiff asserts that attempts to downgrade her job performance evaluations and her referral to the Board were adverse employment actions.

The Court need not address whether these additional allegations constitute adverse employment actions because, as noted above, Defendant conceded, for purposes of its summary judgment motion that Plaintiff suffered an adverse employment action. The Court notes, however, that Eleventh Circuit precedent makes it clear that acts other than 'ultimate employment actions" (*i.e.*, termination) may constitute adverse employment actions. *Wideman*, 141 F.3d at 1456 (citing demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations as examples of adverse employment actions). *See also Burlington*, 548 U.S. at 68 (reassignment of job duties is not automatically actionable, but depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in plaintiff's position, considering 'all the circumstances'")(citations omitted).

alleges.   First, as noted above, Plaintiff's retaliation claim is not premised solely upon her termination, but on other alleged adverse employment actions as well.  Indeed, Plaintiff contends that her selection for the C&P unit, the attempt to move her office, and negative performance evaluations were also adverse employment actions implemented by Defendant.

Next, although Defendant claims that no causal connection exists, the Eleventh Circuit has established that the causal link element is to be construed broadly.  In this regard, a plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Pennington*, 261 F.3d at 1266. (citing *Olmstead*, 141 F.3d at 1460 (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

With respect to Dr. Loungani's selection of Plaintiff for the C&P Unit, two facts are significant.  First, the memorandum detailing Plaintiff to the C&P Unit came only one week after Plaintiff filed her formal complaint of harassment with Ms. Dilkes.  Eleventh Circuit case law has made it clear that close temporal proximity between the protected activity and the adverse action may suffice to establish a causal connection.  *Bass*, 256 F.3d at 1119; *Curtis*, 292 F. App'x at 885 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  However, where a plaintiff seeks to establish a causal connection through temporal proximity, the temporal proximity must be 'very close[.]'" *Curtis*, 292 F. App'x at 885 (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  Here, the temporal proximity is extremely close.

Second, documentary evidence contradicts Dr. Loungani's statement that he did not know about Plaintiff's complaint of harassment when he made the decision to detail Plaintiff to the C&P Unit.  A memorandum signed by Dr. Loungani indicates that Dr. Loungani became aware of Plaintiff's sexual harassment complaint on November 16, 2005.  Thus, the document supports a

finding that Dr. Loungani knew about Plaintiff's complaint prior to his decision to detail her to C&P in early December of 2005. Both of these facts can support Plaintiff's contention that Dr. Loungani's decision and Plaintiff's complaint were "not wholly unrelated."

Likewise, the decision to terminate Plaintiff's employment at the VA Center presents similar questions of fact that must be resolved by a jury. Because Plaintiff's termination was based primarily on her alleged refusal to report to the C&P Unit, the reasons that Dr. Loungani selected Plaintiff for the detail are also significant to the causal connection analysis. First, an issue of fact exists as to whether Plaintiff agreed to the transfer to the C&P Unit. Defendant contends that Plaintiff met with Dr. Loungani and agreed to the detail. Plaintiff, in contrast, is adamant that she never agreed to the detail. Genuine issues of material fact also exist as to whether Plaintiff refused to report to C&P as directed. As noted above, Defendant asserts that Plaintiff failed to attend C&P training on multiple occasions. Plaintiff disagrees and contends that there were occasions when she could not attend training due to her own medical appointments or when she had obligations to patients whom she could not leave. Additionally, Plaintiff asserts that on a number of occasions, Dr. Mandi made last minute changes to her schedule. Consequently, a material issue of fact exists as to whether Plaintiff refused to attend C&P training as well as the reasons for any such alleged failure to report. Hence, material issues of fact exist regarding whether Plaintiff can show a causal connection between her complaint of harassment and her termination.

In sum, because the Court finds that material issues of fact exist as to whether there is a causal connection between Plaintiff's complaint of sexual harassment, her selection to work in the C&P Unit and her ultimate termination, Defendant's Motion for Summary Judgment must be denied. Taking the facts in the light most favorable to Plaintiff, a jury could find that Plaintiff has

16

successfully established a *prima facie* case of retaliation.  Indeed, a reasonable jury could find that Plaintiff satisfied the relatively low threshold necessary to establish the causal connection element of her *prima facie* case of retaliation.  Accordingly, under *McDonnell Douglas* and its progeny, the burden shifts to Defendant to set forth a legitimate, non-retaliatory reason for its alleged adverse employment actions.

### 3.    <u>Defendant's Alleged Legitimate Business Reasons</u>

As noted previously, where Plaintiff establishes a *prima facie* case of retaliation, the burden shifts to Defendant to come forward with evidence of a legitimate, non-retaliatory reason for the challenged employment action. *Curtis,* 292 F. App'x at 883 (11th Cir. 2008); *Pennington*, 261 F.3d at 1266 (citing *Olmstead*, 141 F.3d at 1460); *Brown*, 563 F. Supp. 2d at 1378.  Defendant sets forth numerous legitimate, non-retaliatory business reasons for detailing Plaintiff to the C&P Unit and then, ultimately terminating her employment at the VA Center.  In this respect, Defendant avers that Dr. Loungani detailed Plaintiff to the C&P Unit due to a physician staffing shortage caused by two physicians being called to active duty and a third physician's transfer in the hospital to another unit. Additionally, Defendant points to Plaintiff's alleged refusal to report as directed to C&P, her unprofessional behavior, and other acts of insubordination as legitimate reasons for terminating Plaintiff's employment.

The Court finds that  Defendant's reasons are adequate to satisfy the employer's burden of production, and Plaintiff does not appear to suggest otherwise.  *See Vessels v. Atlanta Independent School System*, 408, F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).

Because the Court finds that Defendant has met its burden of providing a legitimate, non-retaliatory reason for its actions, under the *McDonnell Douglas* framework, the burden shifts back to Plaintiff to show that Defendant's reasons are merely pretext and the real reason for its decision was retaliation.

### 4.   <u>Pretext</u>

In order to create a genuine issue of material fact on the question of pretext, Plaintiff must demonstrate that Defendant's proffered legitimate business reason was not the real reason for the employment decision. *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). In other words, a plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations omitted). Plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* In the latter approach, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds*.

A review of the record reveals evidence that would allow a factfinder to potentially disbelieve Defendant's proffered explanation for its actions. As noted previously, the memorandum detailing Plaintiff to the C&P Unit came only one week after Plaintiff filed her formal complaint of harassment with Ms. Dilkes. This short time frame raises a question as to what Dr. Loungani's

motives were in choosing Plaintiff to go to the C& P Unit.  And, although Defendant claims that detailing Plaintiff to the C&P Unit came as a result of a staffing shortage, this fact alone does not explain why Dr. Loungani selected *Plaintiff* to fill the position.  Indeed, Defendant leaves this question unanswered particularly in light of the fact that Dr. Loungani could have selected any one of approximately twenty hospitalists to fill the detail.  Moreover, even if Dr. Loungani made his selection based upon seniority, Plaintiff's deposition testimony indicates that Dr. Loungani had the opportunity to select from other hospitalists who were more junior than Plaintiff.

Additionally, the record suggests that perhaps Dr. Loungani had previously utilized an assignment to the C&P Unit in an effort to punish a physician.  Indeed, according to Plaintiff, Dr. Loungani admitted to her in January of 2006, that he previously utilized the C&P Unit as a way to isolate an employee that he considered to be uncooperative and difficult.  More specifically, Dr. Loungani allegedly admitted to Plaintiff that he had transferred Dr. Kishel to the C&P Unit because she was "disruptive" and a "trouble maker."  Although the Court acknowledges that Defendant denies this assertion, if believed, a factfinder could find that this evidence presents the type of weakness, implausibility, inconsistency, or contradiction to find Defendant's proffered legitimate reasons  unworthy of credence.  If Dr. Loungani had, in fact, used the C&P Unit as a method to "punish" another physician in the past, this fact could negate Defendant's stated legitimate business reasons for its actions.

Moreover, the March, 2005, memorandum signed by Dr. Loungani (and attached to his affidavit in support of Defendant's Motion for Summary Judgment) indicates that Dr. Loungani became aware of Plaintiff's sexual harassment complaint on November 16, 2005.  Thus, the document supports a finding that Dr. Loungani knew about Plaintiff's complaint prior to his decision

19

to detail her to the C&P Unit.  This fact is significant when considered in connection with Dr. Loungani's sworn statement that he did *not* know about Plaintiff's complaint when he made the decision to detail her to C&P.  Although this discrepancy may become benign when explained in context by Dr. Loungani, a jury could likewise conclude that Dr. Loungani was lying about his knowledge of Plaintiff's sexual harassment complaint in attempt to cover up a retaliatory motive. The Court does not opine on which scenario is more likely, but instead finds that this discrepancy should be resolved by the factfinder when considering whether Plaintiff has established pretext.

Finally, Defendant claims that Plaintiff's refusal to report to C&P was the primary reason for Plaintiff's termination.  In her deposition, however, Plaintiff explains that occasions arose when she could not attend training due to her own medical appointments or obligations she had to patients whom she could not leave.  Plaintiff further justifies any perceived "no shows" in the C&P Unit by stating that on a number of occasions Dr. Mandi made last-minute changes to her schedule.  Even Dr. Raimondi agreed that there were times when she would draft a schedule providing Plaintiff with time off and Dr. Mandi would later revise the schedule and deny Plaintiff the leave she requested. If these facts are found to be true, and Dr. Mandi changed the schedule in an attempt to orchestrate a perception that Plaintiff was failing to attend to her duties in C&P, a jury could find that these circumstances support a finding of pretext.

Upon careful review of the summary judgment record, and construing the facts in the light most favorable to Plaintiff, an issue of fact remains concerning whether Defendant was motivated by the proffered legitimate reasons for detailing Plaintiff to the C&P Unit and ultimately terminating her employment with the VA Center.  Typically, a plaintiff who establishes a *prima facie* case and has set forth sufficient evidence to allow a factfinder to disbelieve an employer's proffered

explanation for its actions, creates a jury issue and, hence, a plaintiff will prevail over a defendant's motion for summary judgment. *Reeves v. Sanderson Plumbing Products*, *Inc.*, 530 U.S. 133, 140 (2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997)). For these reasons, the Court must deny Defendant's Motion for Summary Judgment.[8]

## *CONCLUSION*

Accordingly, for the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [D.E. 14] is hereby **DENIED**.

**DONE** and **ORDERED** at Fort Lauderdale, Florida this 30th day of December, 2009.

ROBIN S. ROSENBAUM

United States Magistrate Judge

cc:     counsel of record

---

[8]     The Court recognizes that if Plaintiff is able to demonstrate that Defendant's proffered legitimate reasons are pretextual, Defendant may prevail by establishing a mixed-motive defense. *See Pennington*, 261 F.3d at 1269. To prevail on this defense and avoid liability for Title VII retaliation, an employer must prove "by a preponderance of the evidence that the decision would have been made the same in the absence of discrimination." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1075 (11th Cir. 2003); *Pennington*, 261 F.3d at 1269. The Court need not address the mixed-motive defense at this point however, because it finds that genuine issues of material fact exist which require the case to be presented to a jury.